

Judge Berman

07 CV 10721

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAEWOO LOGISTICS CORPORATION,                    :
                                                 :
                        Plaintiff,               :
                                                 :
        - against -                              :        ECF CASE
                                                 :
KOREA CEMENT CO. LTD. a/k/a                       :
KOREA CEMENT MFG CO.                              :
                                                 :
                        Defendant.               :
------------------------------------------------------------X

RECEIVED
NOV 3 0 2007
U.S....... S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, DAEWOO LOGISTICS CORPORATION ("Plaintiff"), by and through its

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendant, KOREA CEMENT CO. LTD. a/k/a KOREA CEMENT MFG CO. ("Defendant")

alleges, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 et seq.,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under foreign law with an office in Seoul, Korea.

3.    Upon information and belief, Defendant was, and still is, a foreign corporation or

other business entity organized and existing under foreign law with an office in Jang Seong,

Korea.

4.    By a charter party on the GENCON 1976 form, amended and incorporating

additional terms as agreed between the parties, made in Seoul, Korea and dated 11th November

2003 ("the charter party"), Plaintiff and Defendant agreed to a contract of affreightment whereby about 1,000,000 mt of bulk cement was to be shipped annually from China or Japan to Kwangyang, South Korea for a period of 15 years from March-April 2004. *See charter party attached as Exhibit 1.*

5.      Pursuant to Clause 19 of the charter party form, demurrage, *i.e.*, liquidated damages payable by Defendant to Plaintiff for delays in loading and/or discharging cargo from the vessel(s), was payable at the rate of $6,500.00 per day.

6.      Disputes have arisen under the charter party because the Defendant has refused and otherwise has failed to pay outstanding demurrage of $349,508.06, in respect of cargo operation delays experienced in Korea, calculated as 53.77 days x $6,500 per day, which is due to Plaintiff under the charter party.

7.      Pursuant to Clause 24 of the charter party, which references "Centrocon Arbitration Clause" all disputes under the charter party were to be referred to London Arbitration with English law to apply.

8.      As a result of Defendant's breach of the charter party, Plaintiff has commenced arbitration in London on its $349,508.06 demurrage claim. Defendant has appeared in the arbitration and is defending. In its initial defense submissions to the arbitrators, Defendant has admitted that $85,559.71 of the claimed $349,508.06 was owed, has denied liability for the remainder of Plaintiff's claim, and has challenged the jurisdiction of the arbitrators.

9.      On October 9, 2007 the arbitrators issued their First Final Arbitration Award that addressed only Defendant's challenge to their jurisdiction. The arbitrators held (a) that pursuant to Section 31(4) of the Arbitration Act 1996 that they had power to rule on their own jurisdiction; (b) that they had substantive jurisdiction to determine all disputes that arise under or

2

out of the charter party; and (c) that the governing law of the charter party is English law. *See First Final Arbitration Award attached as Exhibit 2.*

10.     The First Final Arbitration Award stated that Defendant must pay (a) Plaintiff's attorneys' fees associated with obtaining the Award and (b) the arbitrators' fees in the amount of £4,400 plus interest at the rate of 7.75% compounded quarterly. Where, as here, the Defendant has failed to pay the arbitrators' costs, that liability falls to Plaintiff who must pay the arbitrators in the first instance and then seek reimbursement from Defendant. Of note, Defendant has paid no part of the First Final Arbitration Award and has paid no part of Plaintiff's demurrage claim notwithstanding that Defendant has admitted that at least $85,559.71 is due.

11.     Plaintiff's solicitors' fees incurred in obtaining the First Final Arbitration Award were $50,000.00.

12.     The arbitrators have not yet issued their award in respect of Plaintiff's demurrage claim in the amount of $349,508.06

13.     As indicated above, under English law, costs, including attorney's fees, arbitrator's fees, disbursements and interest are recoverable as an element of the Plaintiff's claim.

14.     As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s):

| | | |
|---|---|---|
| A. | Principal claim: | $349,508.06 |
| B. | Interest for 3 year at 7.75% compounded quarterly: | $90,504.36 |
| C. | Estimated future solicitors' fees and expenses: | $250,000.00 |
| D. | Estimated future arbitration costs: | $50,000.00 |
| E. | Plaintiff's solicitors' fees incurred in obtaining the First Final Arbitration Award Against Defendant: | $50,000.00 |

3

|    |    |    |    |
|----|----|----|----|
| F. | Arbitrators' fees of £4,400 payable under First Final Arbitration Award: | | $9,075.44 |
| G. | Interest for 3 years at 7.75% compounded quarterly on arbitrators' fees of £4,400 payable under First Final Arbitration Award: | | $2,350.07 |

**Total**                                                                                                              **$801,437.93**

15.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

16.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.    That since the Defendant cannot be found within this District pursuant to

4

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue
an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment
pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also
pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels,
credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any
other funds held by any garnishee within the District which are due and owing to the Defendant
in the amount **$801,437.93** calculated to date to secure the Plaintiff's claims, and that all persons
claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty
Rule B answer the matters alleged in the Complaint;

    D.    That this Court recognize and confirm any arbitration award(s) or judgment(s)
rendered on the claims set forth herein as a Judgment of this Court

    E.    That this Court retain jurisdiction over this matter through the entry of any
judgment or award associated with any of the claims currently pending, or which may be
initiated in the future, including any appeals thereof;

    F.    That this Court award Plaintiff its attorney's fees and costs of this action; and

    G.    That the Plaintiff have such other, further and different relief as the Court
may deem just and proper.

Dated: November 30, 2007
       New York, NY

                      The Plaintiff,
                      DAEWOO LOGISTICS CORPORATION,

                      By: _Charles E. Murphy_

                      Charles E. Murphy (CM 2125)
                      Patrick F. Lennon (PL 2162)
                      LENNON, MURPHY & LENNON, LLC
                      The GrayBar Building
                      420 Lexington Ave., Suite 300
                      New York, NY 10170
                      (212) 490-6050 – phone
                      (212) 490-6070 – fax
                      pfl@lenmur.com

## **ATTORNEY'S VERIFICATION**

State of Connecticut  )
                      )    ss.:    Southport
County of Fairfield   )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    November 30, 2007
          New York, NY

                                        Charles E. Murphy

7

# Exhibit 1

jobroker

L

|  | RECOMMENDED |
|---|---|
|  | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE |
|  | UNIFORM GENERAL CHARTER (AS  REVISED 1922 AND 1976) |
|  | INCLUDING "F.I.O." ALTERNATIVE, ETC. |
|  | (To be used for trades for which no approved form is in fixed) |
|  | CODE NAME: "GENCON"                                         Part  I |
|  | 2. Place and Date |
|  | SEOUL, KOREA, NOVEMBER 11, 2003 |
| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
| DAEWOO LOGISTICS CO.,LTD., SEOUL,KOREA | KOREA CEMENT MFG CO.,LTD., JANG SEONG,KOREA |
| 5. Vessel's name (Cl. 1) | 6. GRT/NRT (Cl. 1) |
| DAEWOO TBN OR SUBSTITUTE |  |
| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| DWCC OF ABT 10,000~13,000 MTS . |  |
| 9. Expected ready to load (abt.) (Cl. 1) |  |
| SEE CLAUSE NO.43 |  |
| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
| ) SAFE BERTH 1 SAFE PORT, RIZHAO CHINA, OTHER CHINESE PORTS OR JAPANESE PORTS PICO | 1 SAFE BERTH 1 SAFE PORT KWANGYANG , SOUTH KOREA |
| 12. Cargo (also state quantity and margin in Owners option, if agreed : if full, and complete cargo not agreed state "part cargo" (Cl. 1) |  |
| ABOUT 1,000,000   METRIC TONS CEMENT IN BULK PER YEAR   DURING CONTRACT PERIOD. CARGO TO BE EVENLY SPREAD WITH ABOUT 10,000~13,000 MTS PER SHIPMENT AND SHIP'S CONSECUTIVE VOYAGES |  |
| 13. Freight rate (also state if payable on delivered on intaken quantity)(Cl. 1) | 14. Freight payment (state currency and method of payment : also beneficiary and bank account) (Cl. 4) |
| USD 9.25 PER MIT F.I.O.S.T. BASIS 1/1 AND RIZHAO/KWANGYANG FREIGHT RATE OTHER THAN RIZHAO TO BE AGREED LATER ON. | SEE CLAUSE 29. |
| 15. Loading and discharging costs (alternative (a) or (b) of Cl. 5) also indicate if vessel is gearless) | 16. Laytime (if separate laytime) for load. And disch. is agreed. Fill in a) and b) if total laytime for load. And disch. fill in c) only (Cl. 6) |
| SEE CLAUSE 5(B) |  |
| 17. Shippers (state name and address) (Cl. 6) | 19. a) Laytime for loading |
|  | C.Q.D. FOR RIZHAO ONLY    (SEE CLAUSE 35 A) |
| TO BE ADVISED | b) Laytime for discharging |
|  | 7,000 MTS PER DAY SHINC (SEE CLAUSE 35 B) |
|  | c) Total laytime for loading and discharging |
| 18. Demurrage/Despatch rate (loading and discharging) (Cl. 7) |  |
| USD 6,500 PER DAY/DHD |  |
| 20. Brokerage commission and to whom payable (Cl. 14) |  |
| NIL |  |
| 21. Additional clauses covering special provisions, if agreed. |  |

ADDITIONAL CLAUSES 18 TO 43 AS ATTACHED ARE DEEMED TO BE FULLY INCORPORATED AND TO FORM PART OF THIS CHARTER PARTY.

It is mutual that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions of Part I shall prevail over those Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| DAEWOO LOGISTICS CO., LTD. | |
| DAEWOO LOGISTICS CO.,LTD | KOREA CEMENT MFG CO.,LTD. |
| Authorized Signature | |

PART II
"Gencon" Charter (As Revised 1922 and 1976)
including "F.I.O." Alternative, etc.

agreed between the party, mentioned in Box 3 as Owners of the ~~liner or motor-vessel~~ named in Box 5, of the gross/nett register tons indicated in box 5 and carrying about the number of tons of deadweight cargo stated in Box 7, now in position as stated in Box 8 and expected ready to load under the Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 3, that: (1–9)

The said vessel shall proceed to the loading port or place stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo ~~(if shipment of deck cargo agreed same to be at Charterers risk)~~ as stated in Box 12 (Charterers to provide all mats and/or wood for dunnage and any separations required, the Owners allowing the use of any dunnage wood on board if required) which the Charterers bind themselves to ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading or so near thereto as she may safely get and lie always afloat and there deliver the cargo on being paid freight on delivered or intaken quantity as indicated in Box 13 at the rate stated in Box 13. (10–20)

2. Owners' responsibility Clause (21)
Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent ~~knowledge of the~~ goods ~~(unless stowage performed by shippers/Charterers or their stevedores or furnished)~~ or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager. (22–31)
~~And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.~~ (32–41)

3. Deviation Clause (42)
The vessel has liberty to call at any port or ports in any order for any purpose, to sail without pilots, to tow and or assist vessels in all situations, and also to deviate for the purpose of saving life and or property. (43–46)

4. Payment of Freight (SEE CLAUSE 29) (47)
~~The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo or main rule of carriage rules on day or days of payment, the receiver of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.~~ (48–52)
~~Cash for vessel's ordinary disbursement at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent to cover insurance and other expenses.~~ (53–56)

5. Loading Discharging Costs (SEE CLAUSE 31) (57)
~~(a) Gross Terms~~
~~The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay for the necessary men on shore or on board the lighters to do the work there, vessel only bringing the cargo on being.~~ (58–63)
~~If the loading takes place by elevator, cargo to be put free to vessel's holds, Owners only paying trimming expenses.~~ (64)
~~Any pieces and or package of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense. The cargo to be received by the Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle.~~ (65–69)

~~(b) F.I.O. and free stowed trimmed~~
~~The cargo shall be brought into the holds, loaded, stowed and or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk liability and expense whatsoever to the Owners.~~ (70–74)
~~The Owners shall provide winches, motive power and winchmen from the Crew if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and or crane if any. (This provision shall not apply if vessel is gearless and stated as such in Box 15).~~ (75–79)
* Indicated alternative (a) or (b), as agreed, in Box 15. (80)

Laytime (81)
~~(a) Separate laytime for loading and discharging~~
~~The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting Sundays and holidays excepted, unless used, in which event time actually used shall count. The cargo shall be discharged within the number of running hours as indicates in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.~~ (82–89)

~~(b) Total laytime for loading and discharging~~
~~The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.~~ (90–94)

~~(c) Commencement of laytime (loading and discharging)~~
~~Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.~~ (95–99)
~~Time actually used before commencement of laytime shall count.~~ (100)
~~Time lost in waiting for berth to count as loading or discharging time as the case may be. SEE CLAUSE 30~~ (101–102)
~~In Gencon information (a) and (b) are to be agreed in Box 16.~~ (103)

7. Demurrage (SEE CLAUSE 38) (104)
~~Ten running days on demurrage at the rate stated in Box 18 per day or pro rata for any part of a day payable day by day to be allowed Merchants altogether at ports of loading and discharging.~~ (105–107)

8. Lien Clause (108)
Owners shall have a lien on the cargo for freight, dead-freight, demurrage and damage for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for detention) incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as the Owners have been unable to is obtain payment thereof by exercising the Lien on the cargo. (109–116)

9. Bills of Lading (SEE CLAUSE 33) (117)
The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, ~~but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be said to the Captain in cash on signing Bills of Lading.~~ (118–122)

10. Cancelling Clause (123)
~~Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 20, Charterers to have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract unless a cancelling date has been agreed upon.~~ (124–132)

11. General Average  IN LONDON (133)
General average to be settled according to York-Antwerp Rules, 1974. Proprietary of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2). (134–137)

12. Indemnity  AND ANY SUBSEQUENT MODIFICATION THEREOF (138)
Indemnity for non performance of this Charterparty, proved damages not exceeding estimated amount of freight for remaining contract period. (139–140)

13. Agency (SEE CLAUSE 40) (141)
~~In every case the Owners shall appoint his own Broker or Agent both at the port of loading and the port of discharge.~~ (142–143)

14. Brokerage (144)
~~A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20.~~ (145–147)
~~In case of non-execution at least 1/3 of the brokerage on the estimated amount of freight and dead freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.~~ (148–151)

15. GENERAL STRIKE CLAUSE (152)
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lockouts preventing or delaying the fulfilment of any obligations under this contract. (153–155)
If there is a strike or lockout not affecting the loading of the cargo or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the first or after port of loading or after her arrival there, Captain or any Agent may ask Charterers to declare that they agree to reckon the laydays as if there were no strike or lockout. Unless Charterers have given such declaration in writing (by telegram if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same freight only paid on loaded quantity (only) having liberty to complete with other cargo on the way for their own account. (156–166)
If there is a strike or lockout affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lockout is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lockout. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lockout affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of discharge, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. (167–181)

16. War Risks ("Voywar 1950") AND SUBSEQUENT AMENDMENT (182)
(1) In these clauses "War Risks" shall include any blockade of any port which it announced as a blockade by any Government or by any belligerent or by any organized body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, (183–187)

PART II
"Gencon" Charter (As Revised 1922 and 1976)
Including "F.I.O." Alternative, etc.

civil commotion, or revolution.

(2) If at any time before the Vessel commences loading it appears 188
that performance of the contract will subject the Vessel or her 189
Master and crew or her cargo to war risks at any stage of the 190
adventure, the Owners shall be entitled by letter or telegram 191
despatched to the Charterers, to cancel this Charter. 192

(3) The Master shall not be required to load cargo or to continue 193
loading or to proceed on or to sign Bill(s) of Lading for any 194
adventure on which or any port at which it appears that the Vessel 195
her Master and crew or her cargo will be subjected to war risks, in 196
the event of the exercise by the Master of his right under this 197
Clause after part or full cargo has been loaded, the Master shall be 198
at liberty either to discharge such cargo at the loading port or to 199
proceed therewith in the latter case the Vessel shall have liberty to 200
carry other cargo for Owners benefit and accordingly to proceed to 201
and load or discharge such other cargo at any other port or ports 202
whatsoever backwards or forwards although in a contrary direction 203
to or out of or beyond the ordinary route, in the event of the 204
Master electing to proceed with part cargo under this Clause 205
freight shall in any case be payable on the quantity delivered. 206

(4) If at the time the Master elects to proceed with part of full 207
cargo under Clause 3 or after the Vessel has left the loading port, 208
if the last of the loading ports, it more than one, it appears that 208a
further performance of the contract will subject the Vessel, her 210
Master and crew or her cargo, to war risks, the cargo shall be 211
discharged, or if the discharge has been commenced shall be 212
completed, at any safe port in vicinity of the port of discharge as 213
may be ordered by the Charterers if no such orders shall be 214
received from the Charterers within 48 hours after the Owners 215
have despatched a request by telegram to the Charterers for the 216
nomination of a substitute discharging port, the Owners shall be at 217
liberty to discharge the cargo at any safe port which may, in their 218
discretion, decide on and such discharge shall be deemed to be due 219
fulfillment of the contract of the contract of affreightment in the 220
event of cargo being discharged at any such other port, the Owners 221
shall be entitled to freight as if the discharge had been effected at 222
the port or ports named in the Bill(s) of Lading or to which the 223
Vessel may have been ordered pursuant thereto. 224

(5) (a) The Vessel shall have liberty to comply with any directions 225
or recommendations as to loading, departure, arrival, routes, ports 226
of call, stoppages, destination, zones, waters, discharge, delivery 227
or in any other wise whatsoever (including any direction or recom- 228
mendation not to go to the port of destination or to delay 229
proceeding thereto or to proceed to some other port) given by any 230
Government or by any belligerent or of any such organized body 231
engaged in civil war, hostilities or warlike operations or by any 232
person or body acting or purporting to act as or with the authority 233
of any Government or belligerent or of any such organized body or 234
by any committee or person having under the terms of the war 235
risks insurance on the vessel the right to give any such directions 236
or recommendations. If, by reason of or in compliance with any 237
such direction or recommendation anything is done or is not done, 238
such shall not be deemed a deviation. 239

(b) If, by reason of or in compliance with any such directions or 240
recommendations, the Vessel does not proceed to the port or ports 241
named in the Bill(s) of Lading or to which she may have been 242
ordered pursuant thereto, the Vessel may proceed to any port as 243
directed or recommended or to any safe port which the Owners in 244
their discretion may decide on and there discharge the Cargo. Such 245
discharge shall be deemed to be due fulfillment of the contract of 246
affreightment and the Owners shall be entitled to freight as if 247

discharge had been effected at the port or ports named in the 248
Bill(s) of Lading or to which the Vessel may have been ordered 249
pursuant thereto. 250

(c) All extra expenses (including insurance costs) involved in 251
discharging cargo at the loading port or in reaching or discharging 252
the cargo at any port as provided in Clauses 4 and 5 (b) hereof shall 253
be paid by the Charterers and or cargo owners, and the Owners 254
shall have a lien on the cargo for all moneys due under these 255
Clauses. 256

17. GENERAL ICE CLAUSE 256
Port of loading 257

(a) In the event of the loading port being inaccessible by reason of 258
ice when vessel is ready to proceed from her last port or at any 259
time during the voyage or on vessel's arrival or in case frost sets in 260
after vessel's arrival, the Captain for fear of being frozen is in at 261
liberty to leave without cargo, and this Charter shall be null and 262
void. 263

(b) If during loading, the Captain, for fear of vessel being frozen in, 264
deems it advisable to leave, he has liberty to do so with what cargo 265
he has on board and to proceed to any other port or ports with 266
option of completing cargo for Owners' benefit for any port or ports 267
including port of discharge. Any part cargo thus loaded under this 268
Charter to be forwarded to destination at vessel's expense but 269
against payment of freight provided that no extra expenses be 270
thereby caused to the Receivers, freight being paid on quantity 271
delivered (in proportion if lumpsum), all other conditions as per 272
Charter. 273

(c) In case of more than one loading port, and if one or more of the 274
ports are closed by ice, the Captain of Owners to be at liberty 275
either to load the part cargo at the open port and fill up elsewhere 276
for their own account as under section (b) or to declare the charter 277
null and void unless Charterers agree to load full cargo at the open 278
part. 279

(d) This Ice Clause not to apply, in the Spring. 280

Part of discharge 281

(a) Should Ice (except in the Spring) prevent vessel from reaching 282
port of discharge Receivers shall have the option of keeping vessel 283
waiting until the re-opening of navigation and paying demurrage, or 284
of ordering the vessel to a safe and immediately accessible port 285
where she can safely discharge without risk of detention by ice. 286
Such orders to be given within 48 hours after Captain or Owners 287
have given notice to Charterers of the impossibility of reaching 288
port of destination. 289

(b) If during discharging the Captain for fear of vessel being frozen 290
in deems it advisable to leave, he has liberty to do so with what 291
cargo he has on board and to proceed to the nearest accessible 292
port where she can safely discharge. 293

(c) On delivery of the cargo at such port, all conditions of the Bill of 294
Lading shall apply and vessel shall receive the same freight as if 295
she had discharged at the original port of destination, except that if 296
the distance of the substituted port exceeds 100 nautical miles, 297
The freight on the cargo delivered at the substituted port to be 298
increased in proportion. 299

ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

## 18. PERFORMING VESSEL

### DAEWOO 'TBN'

Vessels to be self–loading and self–discharging cement in bulk equipped with both pneumatic and mechanical system at load and discharge port.

Owners guarantee vessels are fitted in all respect to load cement in bulk.

Owners guarantee vessels are p&i covered for entire charter period.

Owners guarantee vessels are fully classed for the entire period.

Owners guarantee all vessel's certificate is valid during the entire charter period.

Vessel's loadable cargo quantity to be about 10,000 – 13,000 metric tons .

## 19. SHIFTING/WHARFING

Shifting and wharfing cost, if any at Owners' account but time to count as laytime in case such shifting and wharfing is requested by shippers, receivers or charterers.

## 20. DETENTION

If cargo or document as far as the charterer's portion is concerned is not ready when vessel arrive at load port , Charterers to pay US$ 6,500 /day for detention charge.. Detention time to commence from 0800 hours next day after N.O.R tendered.

## 21. LOADING AND DISCHARGING OPERATIONS

A. The Charterers shall provide hoses and/or connections and/or loading and discharging installations and/or lighters always with suitable and adequate facilities allowing the loading and discharging of the contracted cargo.

B. Hoses and/or connections for these operations shall be connected and disconnected by the Charterers or, at the option of the Charterers , by the Owners at the Charterers' risk and expense.

C. The cargo shall be pumped into the vessel at the expense of the Charterers, and at their risk as far as the vessel's permanent connections only.

D. The cargo shall be pumped out of the Vessel at the expense of the Owners, and at their risk as far as vessel's permanent connections only.

E. The Vessel shall provide her pumps and the necessary motive power for discharging in all ports where regulations so permit, otherwise the Charterers shall supply shore facilities at their risk and responsibility.

1



ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

F. All equipment for loading and discharging to be in good working order and Owners guarantee their sufficient loading and discharging capacity as stated in Box 19 a) and b). Time lost of breakdown or insufficient handling capacity of the vessel's cargo handling equipments shall not count as laytime or time on demurrage.

## 22. DUES, WHARFAGE AND TAXES

Taxes/dues/wharfage   on cargo to be for Charterers' account.
Taxes/dues/wharfage on vessel/freight to be for Owners' account.

## 23. CONFIDENTIALLY CLAUSE

Negotiations and fixture details on this Charter Party to be kept strictly private and confidential by all parties involved and not to be disclosed to any unrelated party.

## 24. ARBITRATION CLAUSE

Centrocon Arbitration Clause

A) All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final Arbitration of the two Arbitrators.   One to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire.

Any claim must be made in writing and Claimant's Arbitrator appointed within 12(twelve) months of the final discharge date and where this provision is not complied with, the claim shall be deemed to be waived and absolutely barred.

No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to this action be taken before the award made.

B) If the disputed amount is not exceeding US$50,000 the dispute is to be referred to the LMMA Small Claims Procedure.

## 25. PORT GUARANTEE

Owners guarantee that the vessel is allowed in load/discharge port(s) mentioned in or covered by the Charter Party and that the vessel is not blacklisted by local Authorities and/or by Union for whatever reasons.   Owners guarantee that the vessel is allowed to call all ports involved without any additional costs/consequences for Charterers due to flag/ownership etc.

## 26. ADDITIONAL CLAUSES

New Both to Blame Collision Clause, General paramount Clause (for American waters U.S.A. Paramount Clause), P & I Bunkering Clause are deemed to be incorporated in this Charter party.

2

ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

## 27. NOTICE CLAUSE

Master of Owners or Agents to cable draft fore and aft and ETA on fixing of the vessel. Also 3 days approximate and 48/24 hours definite notice before load readiness at loading port(s) and on sailing loading port and 48/24 hours definite notice before arrival at each discharging port(s), both to load/discharge port(s) Agents and to Charterers.

## 28. FORCE MAJEURE

Any act of God, strike, riots, lockout, civil commotions, combination or stoppages of workmen, fire and any other cause comprehended in the Force Majeure terms which may delay or prevent provision at the port of loading and the loading/discharging of the cargo, such time shall not count as laytime. Neither Charterers nor Shippers nor Suppliers nor Receivers shall be liable for any loss of demurrage resulting from any such excepted causes, unless the vessel is already on demurrage. If part cargo has already been loaded, Owners must proceed with same, freight payable on loaded quantity only, having liberty to complete with other non contaminating cargo on the way for their own account, if any official export stop is announced or if existing exports permit is cancelled, the Charter Party can be cancelled by Charterers without claims for damages from Owners' side, in case vessel has not arrived at loading port, but if the vessel has already arrived loading port, Charterers shall pay Owners the actual expenses for calling/deviation.

## 29. FREIGHT PAYMENT

100 percent freight payable within 3 banking days after sailing of vessel from port of loading and signing/releasing of Bills of Lading marked "Clean on board" & "Freight payable as per Charter Party".

Full style of Owners' bank to be advised.

## 30. DEMURRAGE

Charterers to pay demurrage at load and discharge ports, if incurred, for working time used in excess of the allowed laytime.

Demurrage claims, if any, to be settled within 10 days after completion of the voyage and after receipt of the laytime computations supported by the relevant documents without delay and if not settled, a dispute shall be deemed to have arisen and such claim may be referred to Arbitration.

## 31. SEAWORTHY TRIM

Vessel to be always in safe seaworthy trim between ports/berths.

3

ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

### 32. SUPERINTENDENT CLAUSE

Charterers have the option to put a Superintendent on board the vessel during the load port operations.

### 33. BILL OF LADING CLAUSE

A. Bills of Lading forms to be used is codename "CongenBill"

B. At the port of loading to issue and to sign clean Bills of Lading as per Mate's receipt marked "Freight payable as per Charter Party".

C. On arrival at load port, Master to sign written authority that agents are authorized to issue/sign/release Bills of Lading according to this clause, failing which, Charterers are  allowed to charge Owners with possible losses including interests resulting out of such failure.

D. When "Clean on Board" Bills of Lading are needed and if cargo should not be clean, Master to refuse same prior loading and other clean cargo is to be loaded.

If original Bills of Lading not available at discharging port upon vessel's arrival, the Owners/Master to allow discharging/release of cargo against Charterers' single Letter of Indemnity in owners P & I CLUB standard wording only without bank endorsement or Receivers' Letter of Indemnity with bank endorsement

### 34. NOTICE OF READINESS/COMMENCEMENT OF LAYTIME

A.  Load Port

Notice of readiness may be tendered on arrival at pilot station of Load port at any time of the day ,night, Sunday and holiday included

B.  Discharge Port

aa) Notice of readiness may be tendered on arrival at pilot station of Discharge port at any time of the day ,night, Sunday and holiday included with the effect that laytime shall commence 12 hours turn time after tendering notice of readiness.

bb)If vessel berth within 12 hours after tendering notice of readiness, laytime to be commenced upon commencement of loading, which shall not exceed the time to count laytime under clause aa) of B.

C.  If after inspection of pratique or custom clearance, the vessel is found not to be ready for load or discharge time lost after the discovery thereof until the vessel is again ready to load or discharge

4

ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

shall not count as laytime.

## 35. LOADING AND DISCHARGING RATE

A. Loading rate

The cargo shall be loaded at customary quick dispatch.

B. Discharging rate

The cargo shall be discharged at the rate of 7,000 metric tons weather working days as stated in Box 19 b) per day of 24 consecutive hours, Sunday and holiday included .

Laytime shall count for raining and snowing time.

In case Port Authority do not allow to load cargo during raining and snowing time for safety purpose or when ordered by authorities concerned from any other causes whatsoever, laytime shall not count during that time of period.

## 36. VESSEL'S INSURANCE CLAUSE

Vessel is fully insured against General Average, Salvage Charges and Collision as far as the ship's proportion is concerned.

Vessel is fully insured on hull and machinery and entered into a P&I Club for other risks.

## 37. STEVEDORE'S DAMAGE CLAUSE

All claims for damages allegedly caused by stevedores to be settled directly between the Owners and Stevedores at loading and discharging port(s). Such damage, if any, to be reported in writing by Master within 24 hours of occurrence. If Owners are unable to settle immediately in amicable way with Stevedores, Charterers will do their utmost and will use their influence to reach as soon as possible an amicable settlement. .

## 38. DAMAGED CARGO CLAUSE

In case the vessel arrives at the port(s) of discharge and the cargo is determined to be in a damaged condition attributable to the vessel, (causes of damages to be determined by mutual surveyor(s) if . necessary), any extra expenses over and above the contracted discharge costs between Charterers and Stevedores to be paid/settled directly between Stevedores and Owners P&I Club on behalf of owners, or Time Charter/disponent Owners. Time lost as a result of same not to count as laytime or time on

5



ADDITIONAL CLAUSE TO "DAEWOO TBN "
CHARTER PARTY DATED 11th NOVEMBER, 2003

demurrage.

## 39. CONSECUTIVE VOYAGE :

Charterers guarantee ship's consecutive voyages and vessel will proceed to load port upon completion of previous voyage during contract period. In case vessel is idle due to Charterers' defaults like cargo non-readiness etc, Charterers to pay usd 6,500 per day to Owners for ship's idle time.

## 40. AGENCY CLAUSE

Owners' agents at loading port and discharging ports to be nominated.

## 41. LIGHTENING CLAUSE

The Charterers shall have the right to lighten the vessel at their risk and expense. The Charterers shall supply fenders and other equipments necessary for this operation at their expense. Any time lost thereby, including shifting, shall count as laytime. Lightening shall be effected only at a place or places where the Vessel can continuously lie safely and always afloat.

## 42. DEADFREIGHT CLAUSE

A. Should the Charterers or their agents fail to supply a cargo as specified in Box 12 and/or declared by Master , deadfreight shall be payable in the manner specified for payment of freight.

B. For calculating deadfreight, deadweight cargo carrying capacity to be 10,000 tons more or less 10% basically.

## 43. CONTRACT PERIOD

The cargo shall be transported with about 10,000-13,000 metric tons per shipment and ship's consecutive voyages for 15 years starting from first shipment for which the first vessel will be placed in the load port between March – April 2004. The second vessel will be place at load port within two months after first vessel starting service. Owners to nominate first vessel latest by one month prior to first shipment.

The chartered vessel to be used for first three years and thereafter both parties to study conversion of bulk carriers and/or new buildings to find best possible economic results.

- END -

6

附錄 A

Centrocon 1914/1974

## CHAMBER OF SHIPPING RIVER-PLATE CHARTER

"PARTY" "HOMEWARDS"

............ at ... London.............................. 19

............ It is this day mutually agreed between ........................
............................................................................ as Agents (Brokers),

DESCRIPTION    1. for and on behalf of the Owners of the good screw
OF STEAMER    Steamer called the ......................... of the measure-
............ ment of ............................. tons gross and .............
............................ which are registered as there abouts, classed ........
............................ and to be of that class at the time of loading.
now ....................................................................
....................................................................
....................................................................
................................ being .......... Messrs ........................
............................ as ..................... as Charterers.

CHARTERERS    2. That the said Steamer being tight, staunch and
DESCRIPTION    strong, and in every way fitted for the intended voy-
OF CARGO    age, shall with all convenient speed, after arrival at
............ Montevideo or at an Argentine port, not south of
............ Bahia Blanca, and after discharge of her inward Car-
............ go, if any, proceed as ordered by the Charterers or
............ their Agents to the undermentioned ports or places
............ and there receive from them a full and complete Cargo
............ of Wheat and/or Maize and/or Rye and/or Linseed
............ and/or Rapeseed in bags and/or bulk, which Cargo

— 641 —

.................custom of the Port for Steamers, unless otherwise
...provided for as per clause 25, on being paid freight, at
the rates hereinafter mentioned.

**FREIGHT** §. ....................per ton for Wheat and/or Maize and/
or Rye, loaded in the River Parana, ....................
........per ton less for Wheat and/or Maize and/or Rye
loaded at Buenos Ayres or La Plata. Sixpence per ton
less on the entire Cargo, if loaded at one up-river port
only. .... .... .

Charterers have the option of loading at a third safe
port or place in the River Parana within the above
limits in proper rotation downwards, in which case
the freight to be sixpence per ton more on the entire
Cargo. ....

Charterers have the option of loading the entire Cargo
at Buenos Ayres or La Plata at ..................... per ton for
Wheat, Maize or Rye .... ....
for Bahia Blanca at ..................... per ton for

Two shillings and sixpence per ton more if ordered
to discharge at Rouen ....
One shilling and sixpence per ton more if ordered to
discharge at Nantes .... ....
One shilling per ton more if ordered to discharge at
other French Ports ....
Sixpence per ton more if ordered to discharge at
Hamburg. ....

.... more if ordered to discharge at ....
.... less ....

Sixpence per ton less if ordered to a direct port of

— 643 —

---

the said Charterers bind themselves to ship, not exceeding what she can reasonably stow and carry over and above her tackle, apparel, provisions, and furniture. Any damage to existing necessary being for account of the Steamer.

3. The Steamer shall load as follows, viz., at one or two safe loading ports, or places in the River Parana, not higher than San Lorenzo, always afloat, in proper rotation downwards; as much Cargo as the Master considers safe (such quantity to be declared in writing by the Master when Shippers are actually ready to commence to load), but not more than the Steamer can safely carry over Martin Garcia Bar (without Lightening), and the balance of the cargo in the Port of Buenos Ayres or La Plata, at Charterers' option (to be declared by Charterers in writing before the Steamer is ready to leave her last up-river loading port).

**DESTINATION** 4. Being so loaded the Steamer shall with all reasonable speed therewith proceed to St. Vincent (Cape Verdes) or Las Palmas or Teneriffe (Canary Islands) or Madeira or Fakau, at the Master's option, for orders (unless these be given to him by Charterers on signing Bills of Lading) to discharge at a safe port in the United Kingdom or on the Continent between Bordeaux and Hamburg both included (Rouen also included)

or so near thereunto as she can safely get, always afloat, and deliver the Cargo in accordance with the

— 642 —

**LOADING PORTS**

...heavy grain; the Owners being entitled to all extra ex-
... penses in loading and discharging the other lawful
... merchandise loaded over heavy grain.

... if in option of shipping other lawful merchandise is
... exercised and the total cargo loaded is less than the
Steamer's deadweight capacity for Wheat in bags for
this voyage as per this Charter-Party, the difference
... between these quantities shall be divided by the rate
for loading and by this rate for discharging heavy grain
in bags, and the resulting periods of time shall be
added to the laydays at the loading and discharging
ports respectively.

... The Charterers to have the full reach and burden of
... the Steamer including 'tween and shelter decks,
... bridges, poop, etc. (provided suits are not occupied
... by Bunker Coals and/or Stores).

OPTION OF    7. Charterers have the option of loading at one or two
OTHER            safe ports or places above San Lorenzo, but not higher
LOADING          than Cabuzteal, in proper rotation downwards (the ro-
PORTS.           tation of Paraná and Santa Fé to be at Charterers op-
This clause may  tion). Should this option be called of, Charterers to
be deleted        supply a bove, Sah Lorenzo such quantity of cargo as
                 it may be required by the Master, (to be declared by him
                 in writing when Shippers are actually ready to com-
                 mence to load) not exceeding what the Steamer can
                 load, always afloat, and safely bring down without
                 lightening, usual rates of freight upon said quantity shall
                 be on shilling per ton extra.

                 Should the Steamer be loaded at two safe ports or
                 places above San Lorenzo, Charterers have the right
                 of thereafter loading at San Lorenzo or one safe port

— 645 —

---

discharge within the range of this Charter-Party, said
... port of discharge, to be declared on signing final Bill of
Lading and all Bills of Lading signed previous to
... completion of loading to contain the clause "Destina-
tion as per final Bill of Lading."

For Linseed and/or Rapeseed the rate of freight
shall be ... per ton more than the rate for
Wheat; Maize or Rye.

All per ton of 2,240 lbs., English, gross weight
delivered.

OTHER CAR-  6. Charterers have the option of shipping other lawful
GO             merchandise, Cotton, Sugar, Quebracho Wood, Que-
               bracho Extract, Oils in bulk and Distillery Residue ex-
               cluded, in which case freight to be paid on Steamer's
               deadweight capacity for Wheat in bags on this voyage
               as per this Charter-Party, at the rate above agreed on
               for heavy grain (the extra freight for Linseed and/or
               Rapeseed not applying), but the Steamer not to earn
               more freight than she would if loaded with a full cargo
               of Wheat in bags. (This option can only be used if the
               quantity of other lawful merchandise as above shall
               amount to not less than 200 tons. All extra expenses
               in loading and discharging such merchandise over
               heavy grain to be paid by Charterers. But if the option
               of shipping other lawful merchandise is exercised and
               the total cargo loaded is less than the Steamer's dead-
               weight capacity for Wheat in bags for this voyage as
               per this Charter-Party, Charterers shall be entitled to
               the saving in loading and discharging expenses on the
               difference between these quantities at the rate for

— 644 —

or place in the river below, but should the Steamer be loaded at only one safe port or place above San Lorenzy Charterers shall have the right of thereafter loading at two safe ports or places in the river not above San Lorenzo. In the event of the Steamer being loaded at only two of the three ports or places as stated in this clause, freight on the entire cargo shall be reduced by sixpence per ton (as provided for by clause 4-16).

REDUCTIONS

8. With reference to the reductions named in clauses 5 and 7, it is agreed that only one reduction of sixpence per ton is to be allowed.

LOADING BERTHS

9. Steamer to shift at her own expense to a second safe shoot or berth, in any rotation, at each loading port or place if required by Charterers. If it is necessary for the Steamer to get up steam to enable her to shift to a second loading shoot or berth notice to be given before loading at the first berth is completed otherwise time lost to count as lay days. Charterers have the option of loading at a third safe shoot or berth at each port or place, thus paying all expenses of shifting to said third shoot or berth, and time occupied in shifting to such shoot or berth to count as lay days.

LIGHTERAGE

10. Owners to have liberty to lighten if required to cross bars and/or shoals in the River Parana at the Steamer's expense and the Merchant's risk, provided Steamer has not 'else option to complete at Buenos Ayres or La Plata, but the Master to give notice before lightening to enable the Charterers to send their representative on board.

LOADING ORDERS

11. Orders for the first loading place or place shall be given on, within four running hours after receipt of written or telegraphic application of the Master or Agents to the Charterers or their Agents in Buenos Ayres, between 9 a.m. and 6 p.m. , Saturdays 9 a.m. to 4 p.m. (Sundays and Holidays excepted), upon the completion of discharge of the inward cargo, or upon notice of arrival in ballast in free pratique at Montevideo or at an Argentine port not south of Bahia Blanca. Charterers, however, shall not be bound to give orders as to first loading port or place earlier than in reasonable time to enable the Steamer to reach such loading port or place by the lay days date) otherwise all time lost to the Steamer through waiting for orders shall be reckoned as loading time, for in the event of this Charter being cancelled, shall be paid for, at the demurrage rate hereinafter mentioned.

When giving orders Charterers shall declare in writing whether they intend to load any Cargo in bulk, otherwise the time lost in putting up shifting boards (if required) shall count as lay days provided such shifting boards be erected with customary despatch. Should the Charterers elect to load in bulk they must supply a sufficient quantity of Cargo in bags for safe stowage as required by the Master, but not exceeding 15% of the entire Cargo, such quantity to be declared in writing by the Master before commencing to load.

**LAY DAYS**
**AND**
**CANCELLING**

12. Lay days shall not commence before ...... ...... unless Charterers begin loading sooner and should the Steamer not be ready to load by 6 p.m. on ...... the option of cancelling this Charter-Party, unless more time has been lost through waiting for the orders then mentioned in the previous clause in which case the loading date shall be correspondingly extended. For the purpose of this clause the preliminary notice of readiness to load stipulated for in clause 12; shall not be obligatory, and in no case shall the absence or non-readiness of shifting berths constitute a reason for cancelling this Charter-Party.

**RATE OF**
**LOADING**
**DEMURRAGE**

13. The Steamer shall be loaded at the rate of 500 tons per running day Sundays and Holidays excepted, otherwise demurrage shall be paid by the Charterers at the rate of twopence sterling per gross register ton per running day for Steamers of up to 4,000 tons deadweight Cargo capacity and of threepence sterling per gross register ton per running day for Steamers of over 4,000 tons deadweight Cargo capacity. Time for loading shall commence to count 12 hours after written notice has been given by the Master or Agents on any day (Sundays and Holidays excepted), between 9 a.m. and 6 p.m., to the Charterers or their Agents that the Steamer is ready to receive Cargo, but the said notice to be given at the first port or place of loading only.

**EXTRA WORK**

14. The Steamer to work at night, if required by the

— 648 —

Charterers, they paying all extra expenses for such work.

**TIME NOT TO**
**COUNT**

15. Time occupied in executing shifting boards (if due notice his been given by the Charterers of their intention to load in bulk) also time occupied in shifting between the loading ports or places, or any time lost in loading caused through the Steamer undergoing repairs or when loading is stopped by the Master's order, or by detention in quarantine, not to count as lay days.

**DESPATCH**
**MONEY**

16. Despatch Money (which is to be paid to Charterers before Steamer sails) shall be payable for all time saved in loading (including Sundays and Holidays) at the rate of £10 sterling per day for Steamers up to 4,000 tons Bill of Lading weight, and £15 sterling per day for Steamers of over 4,000 tons Bill of Lading weight. Should there be any dead freight the same to be included in either case. Should the Steamer's outturn (including dead-freight, if any) on which despatch money has been paid at the rate of £15 fall below 4,000 tons, less an allowance of 1½ per cent. for Mate's per cent. for any other Cargo, the difference of £5 per day in the despatch money to be refunded to the Steamer by Charterers.

**CARGO**
**ALONGSIDE**

17. The cargo to be brought to and taken from alongside at Charterers' risk and expense.

**STEVEDORES**

18. The Charterers shall provide Stevedores to load the cargo ... to the Vessel of twenty-five cents gold per English ton.

**CAPACITY**

19. Owners undertake that the Steamer shall not load

— 649 —

more than........tons and not
less than........tons English weight
of Wheat and/or Maize.

20. The Freight shall be paid as follows, viz.: Sufficient
cash for Steamer's use, if required by the Master
(not exceeding one-third of the freight) to be ad-
vanced by Charterers on signing Bills of Lading, in
Buenos Ayres, Rosario, or Bahia Blanca (at the
Master's option), on account of Freight at current
rate of exchange for approved commercial bills on
London, subject to 3% (three per cent.) to govern in-
terest, insurance and other charges, and the balance
of Freight on the right and true delivery of the cargo,
in cash, H. on the Continent and the rate of Freight
be in sterling, freight to be paid in cash at current
rate of exchange for Bankers' sight bills on London.

BILLS OF
LADING

21. The Master to sign Bills of Lading in the form en-
dorsed hereon at any rate of freight that the Char-
terers or their agents may require, but any difference
in amount between the Bill of Lading freight and the
total gross chartered freight, as above, shall be set-
tled at port of loading before the Steamer sails, if in
the Steamer's favour to be paid in cash on/or before
signing Bills of Lading, if in Charterers' favour by
usual Master's bill payable five days after arrival at
port of discharge or upon collection of freight
(whichever occurs first) and such bill is hereby made
by Owners a charge on Bill of Lading freight and the
said freight is hereby hypothecated as security for
said bill.

650 —

WHEN

....The Owners or Master shall have an absolute lien on
the Cargo for the recovery of all Bill of Lading
freight, dead-freight and demurrage, but the
Charterers' liability shall cease upon the shipment of
the Cargo and payment of dead-freight, difference in
freight and demurrage provided such Cargo be worth
the Bill of Lading freight at the port of shipment.

ORDERS FOR
PORT OF DIS-
CHARGE

22. Orders as to Port of Discharge are to be given to the
Master within 24 hours after receipt by Consignees of
Master's telegraphic report to Consignees (whose
name and cable address are to be given in writing) by
Charterers to the Master before sailing from the last
loading port) of his arrival at the Port of Call, and
for any detention waiting for orders, after the afore-
said 24 hours, the Charterers or their Agents shall
pay to the Steamer Thirty Shillings Sterling per
hour. The Master shall give written notice to Char-
terers before signing final Bill of Lading whether he
will call at St. Vincent, Las Palmas, Teneriffe,
Madeira or Dakar for orders. Should cable communi-
cation with the Port of Call be interrupted, Steamer
shall proceed to Lisbon, Queenstown or Falmbutti,
at the Master's option, for orders; and the Master is
to advise Charterers' Agents of his arrival at such
Port of Call.

FINAL
ORDERS

23. Charterers have the option of ordering the Steamer
from the Port of Call to Falmouth for final orders to
discharge at a safe port in the United Kingdom or on
the Continent between Havre and Hamburg, both in-
cluded (Rouen, if allowed, as per clauses 4 and 6, al-
so included). Final orders shall be given at Falmouth

— 651 —

as provided for in clause 22; and the freight shall be increased by sixpence per English ton, on the entire cargo. ....

24.  If discharged in London and required by Charterers, Steamer is to discharge also at a second berth in the same dock, as ordered, provided the berth be ready (or time waiting for such second berth to count.) Charterers contributing £210 for cost of shifting.

" Steamer is not to be required to discharge at Tilbury Docks. ....

25. If discharged in Avonmouth and so required by Charterers the Vessel shall discharge also at a second berth, as ordered by them, provided the berth be ready (otherwise time waiting for such second berth shall count), the Charterers contributing £20 towards the cost of shifting to the second berth.

25. The time for discharging at destination shall be in accordance with the custom of the Port for Steamers at port of Discharge, except as hereinafter provided; demurrage, if incurred, to be paid by Consignees at the rates stipulated in clause 33.

For grain cargoes without fixed lay-days. At Bristol Old Docks, 500 tons per day; minimum, 6 days whole barges. Avonmouth, Portishead and Sharpness 600 tons per day; minimum, 6 days whole cargoes what if over 6,000 tons, 650 tons per day. And if 3,000 tons or over 750 tons per day. All based on Bill of Lading quantities. Reporting day not to count. Running days (Holidays, etc., excepted) as per 1896 Charter.

---

IRISH PORTS   At Irish ports the Vessel shall be discharged at the following average rates per day and pro rata (Sundays and Holidays excepted).—At Dublin and Belfast, 600 tons; at other Irish ports, 500 tons; all based on Bill of Lading quantities. Reporting day shall not count unless used.

LONDON   At London, unless with the consent of the Receivers, the Steamer shall not discharge more than 1,250 tons per working day; Reporting day not to count.

DUTCH PORTS   At Dutch ports cargo to be received as fast as Steamer can deliver during the ordinary working hours, failing which the Captain has the right to discharge into lighters and/or land the Cargo at Consignee's risk and expense, or to claim demurrage; the Captain however, if not entitled to discharge more than 600 tons if Cargo is under 6,000 tons and 700 tons if Cargo is over 7,000 tons (Bill of Lading quantity) on any one day (except at Steamer's risk and expense) unless Consignees are willing to take a larger quantity. Consignees are not bound to receive on, the day of shipment's reporting at the Custom House.

INSUFFI-   96. Should the Steamer be ordered to discharge at a place
CIENT   to which there is not sufficient water for her to get
WATER AT   the first tide after arrival without lightening, she is to
DISCHARGING   always afloat; lay days are to count from 48 hours after
PORT   her arrival at a safe anchorage for similar vessels bound for such place and any lighterage incurred to enable her to reach the place of discharge is to be at the expense and risk of the Receiver of the Cargo; any custom of the port to the contrary notwithstanding, but time occupied in proceeding

--- 653 ---

--- 652 ---

ICE

27. The Charterers by their Agents have the right to be on board the Steamer whilst loading or discharging, for the purpose of inspecting the cargo, checking the weight, and supervising their interests.

28. Should the Steamer be ordered to a Port of Discharge on the Continent inaccessible by reason of Ice, the Master shall have the option of waiting until the port is again open, on of proceeding to the nearest safe open port or roadstead (telegraphing his arrival there to Consignees), where he shall receive fresh orders for an open and accessible Port of Discharge, in the United Kingdom, or Continent as above, within 24 hours after arrival, or lay days to count. If so ordered, the Steamer shall receive the same freight as if she had discharged at the port to which she was o-riginally ordered, but if ordered to a port more then 100 nautical miles distant from such open port, or roadstead, the freight, shall be increased by one shilling per English ton, as above. In no case shall the Steamer be ordered from a Port of Call in the United Kingdom to an icebound port.

EXCEPTIONS 29. The Steamer shall not be liable for less or damage occasioned by the Act of God, by Quarantine Restrictions, by Perils of the Sea, or other Waters, by Fire, from any cause or wheresoever occurring, by Barratry of the Master on Crew, by Enemies, Pirates, or Thieves, by Arrest or Restraint of Princes, Rulers or People, by Riots, Strikes or Stoppages of Labour, by explosion, bursting of Boilers, Break-

654 —

---

...ages of Shafts or any Latent Defects in Hull, Machinery, or Appurtenances, by Collision, Stranding or other Accidents arising in the Navigation of the Steamer, even when occasioned by the negligence, default or error of judgment of the Pilot, Master, Mariners or other Servants of the Shipowners or Persons for whom they may be responsible (not resulting, however, in any case from want of due diligence by the Owners of the Steamer, or by the Ship's Husband or Manager), that nothing herein contained shall exempt the Shipowners from liability for damage or loss to cargo occasioned by bad stowage, by improper or insufficient Dunnage, by absence of efficient ventilation, or by improper opening of Valves, Sluices or Ports. The Owners shall not be liable for any delay in the commencement or prosecution of the Voyage due to a General Strike or Lock-out of Seamen or other persons necessary for the movement or navigation of the Vessel.

The Steamer shall have the liberty to call at any port or Ports, in any order, for the purpose of taking or Bunker Coal or other Supplies, to sail without Pilots, to tow and be towed, to assist Vessels in distress and to deviate for the purpose of saving life or property.

STRIKES 30. If the Cargo cannot be loaded by reason of Riots, Civil Commotions or of a Strike or Lock-out of any class of workmen essential to the loading of the Cargo, or by reason of obstructions or stoppages beyond the control of the Charterers on the Railways, or in the Docks, or other loading places, or if the Cargo

655 —

CONSIGN- 34. Steamer to be consigned at Port of Discharge to
MENT Owners or their Agents by whom the Steamer is to
be reported at the Custom House.

DISCOUNT 35. Four per cent. Discount is due by the Steamer upon
the gross amount of freight, dead-freight, and de-
murrage, etc., on shipment of cargo to ......

RECHARTER- 36. Charterers to have the right to transfer this Charter-
ING Party, but in such case the original Charterers shall
remain responsible for the right and true fulfilment of
same.

BROKERAGE 37. The brokerage of 5 per cent. on the amount of
freight, dead-freight and demurrage is due on the
signing of this Charter to ......
by whom the Steamer is to be reported at London
should she discharge there.

CONTRIBU- 38. Steamer to pay to "Union Protectors" the bro-
TION bre a contribution of £2 at the last port of load-
ing.

ARBITRA- 39. All disputes from time to time arising out of this con-
TION tract shall, unless the parties agree forthwith on a
single Arbitrator, be referred to the final arbitrement of
two Arbitrators carrying on business in London
who shall be Members of the Baltic and engaged in
the Shipping and/or Grain Trades, one to be ap-
pointed by each of the parties, with power to such
Arbitrators to appoint an Umpire. Any claim must
be made in writing and Claimant's Arbitrator ap-
pointed within three months of final discharge and
where this provision is not complied with the claim
shall be deemed to be waived and absolutely barred.

— 657 —

---

it can not be discharged by reason of Riots, Civil Com-
motions, or of a Strike or Lock-out of any class of
workmen, essential to the discharge, the time for
loading or discharging, as the case may be, shall not
count during the continuance of such causes, provid-
ed that a Strike or Lock-out of the Shippers' and/or
Receivers' men, shall not prevent demurrage accruing
if by the use of reasonable diligence they could have
obtained other suitable labour at rates current before
the Strike or Lock-out. In case of any delay by rea-
son of the before-mentioned causes, no claim for
damages or demurrage, shall be made by the Char-
terers, Receivers of the Cargo, or Owners of the
Steamer. For the purpose, however, of settling
despatch money accounts, any time lost by the
Steamer through any of the above causes shall be
counted as time used in loading.

AVERAGE 31. Average, if any, payable according to York-Antwerp
Rules, 1974.

WAR 32. If the nation under whose flag the Steamer sails shall
be at War, whereby the free navigation of the Steam-
er is endangered, or in case of blockade or prohibi-
tion of export of grain and seed from the loading
port, this Charter shall be null and void at the last
outward port of delivery, or at any subsequent period
when the difficulty may arise, previous to cargo be-
ing shipped.

CLEARANCE 33. The Master to apply at loading ports to Charterers or
their Agents for cargo, and Steamer to be cleared at
Custom House by ......paying them a
clearance fee of $100 gold, once only.

— 656 —

"as ordered at" if their Assigns, he or they paying freight for .........

Port of Call" if Goods in accordance with the Charter-Party dated ......

for orders. ......................... all the terms, conditions and

exceptions of which are incorporated herewith, including the negligence clause I are incorporated herewith.

Weight, measure, quality, and value unknown, and the Shipowners are not responsible for the condition of bags not for loose grain in the hold, unless bags are wilfully cut or damage thereby arises from negligent stowage or handling.

Average, if any, payable according to York-Antwerp Rules, 1974.

IN WITNESS whereof, the Master or Agents of the said Steamship hath affirmed to ........................ Bills of Lading, all of this tenor and date, one of which Bills being accomplished, the others to stand void.

Dated in ..................................................... the ............

...............day of ..........................................19

---

No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his acting be taken before the award is made. ...........................

PENALTY.    40. Penalty for non-performance of this agreement, proved damages, not exceeding the estimated amount of freight.

RENDERS    41. Tenders: when necessary to comply with the Government requirements, shall be provided by the Charterers at a cost to the vessel of £2 per loading berth, which shall include the cost of labour handling the Fenders.

Shipped in good order and condition by ...........................

........................ now lying in the Port of ...........................

(1) If for a Direct Port strike, and bound (*) for Orders, to .....................

out "for Orders" to" and fill in (*) for ...........................via...........................

name of Direct St. Vincent, Las Palmas, Teneriffe, Madeira or Dakar

Port in (2). ing final Bill of Lading.

(2) If for Port (With the liberty to call at any port or ports in any of "Call for Or-" order for the purpose of taking bunker Coals or other supders strike out "plies to sail without Pilots; to tow and be towed; to assist "for .........................vessels in distress, and to deviate for the purpose of saving life or property).

(3) Fill in proper being marked and numbered as per margin and to be de- Port of Dis- livered in the like good order and condition at the Port of charge if for Dischrect Port, or unto ...................................................or to his or

---

Exhibit 2

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

DAEWOO LOGISTICS CORPORATION of Seoul, Korea.    Claimants
(Owners)

and

KOREA CEMENT CO LTD of Jang Seong, Korea.    Respondents
(Charterers)

Charterparty dated 11th November 2003

(for a Contract of Affreightment)

FIRST FINAL ARBITRATION AWARD

2

## IN THE MATTER OF THE ARBITRATION ACT 1996

**AND**

## IN THE MATTER OF AN ARBITRATION

BETWEEN

DAEWOO LOGISTICS CORPORATION of Seoul, Korea.     Claimants
                                                  (Owners)

and

KOREA CEMENT CO LTD of Jang Seong, Korea.     Respondents
                                              (Charterers)

### Charterparty dated 11th November 2003
(for a Contract of Affreightment)

### FIRST FINAL ARBITRATION AWARD

**WHEREAS:**

1.  By a charterparty on the "GENCON" 1976 form, amended and incorporating additional terms as agreed between the parties, made in Seoul, Korea and dated 11th November 2003 ("the Charterparty"), the Claimants ("the Owners") and the Respondents ("the Charterers") agreed a contract of affreightment ("the COA") whereby about 1,000,000 mt of bulk cement was to be shipped annually from China or Japan to Kwangyang, South Korea for a period of 15 years from March-April 2004.

3

2.  Clause 24 of the Charterparty provided for disputes between the parties to be
    referred to arbitration as follows:

    *"24. ARBITRATION CLAUSE*

    *Centrocon Arbitration Clause*

        B)  *All disputes from time to time arising out of this contract shall, unless
            the parties agree forthwith on a single Arbitrator be referred to the final
            Arbitration of the two Arbitrators. One to be appointed by each of the
            parties with power to such Arbitrators to appoint an Umpire.
            Any claim must be made in writing and Claimant's Arbitrator appointed
            within 12(twelve) months of the final discharge date and where this
            provision is not complied with, the claim shall be deemed to be waived
            and absolutely bared.*

            *No award shall be questioned or invalidated on the ground that any of
            the Arbitrators is not qualified as above, unless objection to this action
            be taken before the award made.*

        B)  *If the disputed amount is not exceeding US$50,000 the dispute is to be
            referred to the LMMA Small Claims Procedure."*

3.  Following a dispute between the parties, the Owners appointed me, Alan Oakley
    of Hoy's Farm, Upwick, Ware, Hertfordshire as their nominated arbitrator and the
    Charterers appointed me, David Farrington, Chorley Farm House, West
    Wycombe, Buckinghamshire as their nominated arbitrator. We are both full
    members of the London Maritime Arbitrators Association ("the LMAA") and
    members of the Baltic Exchange in the City of London. By agreeing to appoint us
    on the basis of the current LMAA terms, the parties agreed to vary the arbitration
    terms so as to allow the LMAA Terms 2006 to apply to the reference. However,
    the Charterers made it clear that their appointment of Mr Farrington was made
    *"strictly without prejudice to their rights to claim the validity of the arbitration
    clause in the Charterparty"*.

4

4.  The seat of this arbitration is in England.

5.  The Owners were represented by the firm of Dibb Lupton Alsop, Hong Kong. The
    Charterers were represented by the firm of Kim & Chang, Seoul.

6.  On 31st August 2007, the Owners notified the Tribunal that they had a claim
    against the Charterers for outstanding demurrage in the sum of US$349,508.06.
    At the same time, the Owners made an application for an interim final arbitration
    award pursuant to our powers under Section 31 of the Arbitration Act 1996 ("the
    Act"), to the effect that we have substantive jurisdiction to determine the Owners'
    claims ("the Owners' Application"). Section 31 of the Act provides as follows:

    *"Section 31 - Objection to Substantive Jurisdiction of Tribunal*

    *31.-(1) An objection that the arbitral tribunal lacks substantive jurisdiction at
    the outset of the proceedings must be raised by a party not later than the time he
    takes the first step in the proceedings to contest the merits of any matter in
    relation to which he challenges the tribunal's jurisdiction.
    A party is not precluded from raising such an objection by the fact that he has
    appointed or participated in the appointment of an arbitrator.*

    *(2) Any objection during the course of the arbitral proceedings that the arbitral
    tribunal is exceeding its substantive jurisdiction must be made as soon as
    possible after the matter alleged to be beyond its jurisdiction is raised.*

    *(3) The arbitral tribunal may admit an objection later than the time specified in
    subsection (1) or (2) if it considers the delay justified.*

    *(4) Where an objection is duly taken to the tribunal's substantive jurisdiction
    and the tribunal has power to rule on its own jurisdiction, it may -
    (a) rule on the matter in an award as to jurisdiction, or
    (b) deal with the objection in its award on the merits.*

5

> *If the parties agree which of these courses the tribunal should take, the tribunal*
> *shall proceed accordingly.*
>
> *(5) The tribunal may in any case, and shall if the parties so agree, stay*
> *proceedings whilst an application is made to the court under section 32*
> *(determination of preliminary point of jurisdiction)."*

7.  On 13th September 2007, the Charterers served Defence submissions whereby
    they accepted liability for a balance of demurrage as calculated up to voyage no.
    47 in the sum of US$85,559.71. The Charterers otherwise denied liability for the
    Owners' claim. However, the Charterers sought our discretionary power to rule on
    our substantive jurisdiction and the applicable governing law as a preliminary
    issue ("the Charterers' Application"). The Charterers' submission included a
    comprehensive analysis of their understanding of the relevant provisions of the
    Charterparty as they related to jurisdiction and governing law.

8.  On 18th September, the Owners served a response to the Charterers' Application
    after which we informed the parties that we would proceed to our decision/award.

9.  However, on 26th September, despite our Directions to the contrary, the Charterers
    served further submissions on the matter of our jurisdiction and the governing
    law. On 28th September, the Owners served brief closing submissions, after which
    we informed the parties that we would admit all the latest submissions and that
    were proceeding to our award.

10. Having considered both parties' Applications, we have decided that it is
    appropriate to make an interim final award as to our jurisdiction and the
    governing law of the Charterparty.

11. Neither party requested an oral hearing.

6

12. The reasons for our decisions are attached hereto and form part of this First Final Arbitration Award ("the First Award").

NOW WE, the said Alan Oakley and David Farrington, having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the submissions and correspondence put before us and having given due weight thereto and having discussed the matter between ourselves and being in agreement, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FIRST FINAL ARBITRATION AWARD** as follows:

**WE FIND AND DECLARE** that:

1) Pursuant to Section 31(4) of the Arbitration Act 1996 we have power to rule on our own jurisdiction;

2) we have substantive jurisdiction to determine all disputes that arise under or out of the Charterparty; and

3) the governing law of the Charterparty is English law.

**WE THEREFORE AWARD AND DIRECT** that:

I. the Charterers shall bear and pay their own and the Owners' recoverable legal costs of this First Award on the standard basis which, unless agreed, shall be determined by us hereafter if so requested in an Award on Costs, pursuant to Section 63(3) of the Arbitration Act 1996, on the basis set out in Section 63(5) of the Act for which purpose we hereby reserve our jurisdiction;

II. the Charterers shall pay our costs of this First Final Arbitration Award in the sum of £4,400 provided always that if the Owners have in the first instance paid any sum in

7

respect of the said costs they shall be entitled to immediate reimbursement by the Charterers of the sum so paid together with interest thereon at the annual rate of 7.75% compounded every three months from the date of payment to the date of reimbursement.

THIS ARBITRATION AWARD is interim in the reference, however final as to matters decided herein. We reserve our jurisdiction to make further Award(s) in respect of matters not dealt with herein.

Given under our hands this     9th     day of October 2007.

Alan Oakley

Witness

David Farrington

Witness

8

## Charterparty dated 11th November 2003

(for a Contract of Affreightment)

### REASONS FOR OUR FIRST FINAL ARBITRATION AWARD

1   By a charterparty dated 11th November 2003 ("the Charterparty"), the Claimants
    ("the Owners") and the Respondents ("the Charterers") agreed a contract of
    affreightment ("the COA") whereby about 1,000,000 mt of bulk cement was to be
    shipped annually from China or Japan to South Korea over a period of 15 years
    starting in 2004.

2   In August 2007, the Owners claimed arbitration in respect of outstanding demurrage
    in the sum of US$349,508.06. We do not know any other details about the Owners'
    claim other than the Charterers accept liability for a balance of demurrage up to and
    including voyage no. 47 in year 2007 in the sum of US$85,559.71. They otherwise
    deny liability for the Owners' claim.

3   Both parties made Applications that we proceed to an interim final award on
    jurisdiction and governing law before deciding the merits of the Owners' claim.
    Having considered those Applications, we are satisfied that (a) we have power under
    Section 31(4) of the Arbitration Act 1996 to rule on our own jurisdiction and (b)
    that this is an appropriate case for us to proceed to an interim final arbitration award
    whereby we determine whether we have jurisdiction in the reference and the
    governing law of the Charterparty.

4   Before considering the parties' arguments, we shall recite for easy reference clause
    24 the Charterparty, together with clause 39 of the Centrocon form charterparty.

9

Clause 24 of the Charterparty:

*"24. ARBITRATION CLAUSE*

*Centrocon Arbitration Clause*

    A) *All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator be referred to the final Arbitration of the two Arbitrators. One to be appointed by each of the parties with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimant's Arbitrator appointed within 12(twelve) months of the final discharge date and where this provision is not complied with, the claim shall be deemed to be waived and absolutely bared.*

       *No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to this action be taken before the award made.*

    B) *If the disputed amount is not exceeding US$50,000 the dispute is to be referred to the LMAA Small Claims Procedure."*

Clause 39 of the standard Centrocon form charterparty provides as follows:

    *"ARBITRATION 39. All disputes from time to time arising out of this contract shall, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be Members of the Baltic engaged in the Shipping and/or Grain Trades, one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. Any claim must be made in writing and Claimant's Arbitrator appointed within three months of final discharge and where this provision is not complied with the claim shall be deemed waived and absolutely barred. No award shall be questioned or invalidated on the grounds that any of the Arbitrators is not qualified as above, unless objections to this acting be taken before the award is made."*

13. The Owners argued that the reference in clause 24 of the Charterparty to the
    Centrocon Arbitration Clause and the "LMMA Small Claims Procedure"
    demonstrated the parties' intentions that disputes were to be resolved by
    arbitration in London in accordance with English law. Furthermore, clause 24 of
    the Charterparty made specific reference to the Centrocon Arbitration Clause
    which expressly provides for arbitration in London. The Owners contended that
    the reference to "LMMA" was a mistyping of "LMAA", i.e. a reference to the
    London Maritime Arbitrators Association.

14. The Charterers accepted that clause 24 of the Charterparty provided for the
    Centrocon Arbitration Clause to apply. However, they pointed out that clause 24
    paragraph (A) of the agreed arbitration clause did not refer to "London", whereas
    clause 39 of the standard Centrocon form specifically provided for London. They,
    therefore, contested the validity of arbitration in London. They said that Seoul,
    Korea, was the natural forum for arbitration given the national identity of the two
    parties. The Charterers claimed that they were not familiar with the English
    language and marine terms: we assume that they mean the charterparty terms
    which were in English. The Charterers said that had the Owners intended that
    arbitration take place in London, they should have ensured that clause 24 made
    clear provision for such rather than referring to the Centrocon Arbitration Clause,
    which they, the Charterers, were not familiar with.

15. The Charterers rejected the Owners' contention that the references in clause 24 of
    the Charterparty, the Centrocon Arbitration Clause and the LMAA Small Claim
    Procedure demonstrated the parties' intentions to refer disputes to London
    arbitration. They argued that regardless of whether the reference to the "LMMA"
    Small Claims Procedure in clause 24(B) of the Charterparty was a typographical
    error and that the clause should have referred to the LMAA, they had no idea what
    the LMMA or LMAA stood for. They said that they had no experience of
    arbitration and contended that with no clear reference to "London" in clause
    24(A) of the Charterparty, there was no written agreement to LMAA arbitration.

11

They also referred to Article II(1) of the New York Arbitration Convention of 1958 ("the New York Convention") which requires each Contracting Sate to recognize arbitration agreements which are in writing. The Charterers therefore argued that because there was no clear reference to London in the clause 24 of the Charterparty, there was no written agreement between the parties for London arbitration.

16. The Charterers explained that the parties were Korean, the contract involved shipments from China and Japan to Korea and that all the evidence was in the Korean language. Therefore, they failed to understand why the Owners insisted on London arbitration, unless it was to take advantage of the Charterers' *"uneasy feeling about London arbitration"*. The Charterers also expressed their concern that this dispute involved demurrage and despatch calculations covering 47 voyages under the Charterparty and the cost of arbitrating in London.

17. Before considering the parties' submissions on jurisdiction and governing law, we should make two points clear. First, we accept the Charterers' submission that they raised their objection that we lacked substantive jurisdiction before they had taken any steps in the arbitration proceedings. Therefore, we are satisfied that we can consider both parties' Applications pursuant to the provisions of Section 31 of the Act. Secondly, although the Charterers served submissions on 26th September 2007, after we had told them that we were proceeding to our interim final award, we have admitted those submissions, together with those served by the Owners on 28th September when considering this matter.

18. Both Applications relate to the construction of clause 24 of the Charterparty. This clause is headed "Centrocon Arbitration Clause", which is an arbitration clause that is frequently used by the international shipping community and is often incorporated into different forms of charterparty: it is to be noted that the printed Gencon 1976 form charterparty does not include a provision for arbitration – such provision must be added by agreement of the parties by way of a Rider clause to the charterparty, i.e. as we find in the Charterparty at clause 24. Following the

12

heading "Centrocon Arbitration Clause", clause 24 then contains two paragraphs, namely (A) and (B).

19. Therefore, as a matter of construction, we hold that clause 24 provides for London arbitration in accordance with the provisions of the Centrocon Arbitration clause, subject to any variation made in paragraphs (A) and (B). Paragraph (A) amended the time bar under Centrocon Arbitration Clause for claims to be made within 12 months of discharge rather than 3 months – this is a normal amendment which is made in most charterparties. Paragraph B merely makes provision for the LMAA Small Claims Procedure to apply to disputes of less than US$50,000. Again, this is a normal feature of most charterparties. Therefore, as a matter of construction, neither paragraph (A) or (B) alters the fundamental provisions of the Centrocon Arbitration Clause as it relates to jurisdiction and the governing law, i.e. London arbitration and English law. Although it was not the subject of submissions, we note that clause 11 in Part II of the Charterparty provides for General Average to be settled in London – we consider that it would be unusual if the parties agreed that different types of dispute, possibly arising from the same facts, should be resolved in different jurisdictions and that different laws should apply.

20. The specific wording of clause 24(A) of the Charterparty makes it quite clear that all disputes are to be referred to arbitration. This is not in dispute between the parties. However, the clause omits any reference to a forum or the qualifications of the arbitrators but the words follow almost verbatim the words of the standard Centrocon Arbitration Clause. The clause provides for the appointment of an Umpire which is a procedure available in London when arbitrators disagree. There was no submission by the Charterers that such a procedure is possible in Seoul arbitration. A conclusion that London arbitration was intended by the parties is also supported by the reference in paragraph (B) of clause 24 of the Charterparty to the "LMMA Small Claims Procedure". The reference to "LMMA" is, in our view, clearly a typing error for "LMAA" and refers to the London Maritime Arbitrators Association, which has issued a set of rules which apply to disputes involving small amounts of money. These rules ("The LMAA SCP") are well known within the maritime community and are frequently

13

incorporated into the arbitration clauses of international charterparties. The commentary of the LMAA SCP refers to the main LMAA Terms (2006) which at paragraph 6 makes clear that in the absence of any agreement to the contrary, the parties agree that English law will apply to the reference.

21. However, we observe that clause 24(A) of the Charterparty contains provisions relating to taking objection to the qualifications of an arbitrator even though the clause itself does not require the arbitrators to have any particular qualifications. Rather than strike out the words, we consider that they must be given some meaning. That meaning can readily be ascertained from the standard Centrocon Arbitration Clause which makes specific provision for London arbitrators to be appointed.

22. Although it is not necessary for the purpose of our decision, we shall address some of the specific arguments raised by the Charterers. The Charterers argued that they were not familiar with the terms of the Charterparty, including the arbitration terms. However, it was incumbent upon them to make sure that they understood the terms of the contract when agreeing the fixture. Given the commercial implications of agreeing a 15 year contract with a shipowner, it was a relatively easy matter for the Charterers to get shipbroking or legal advice on the terms of the Charterparty. Also, the Charterers' defence that the contract was in English as opposed to Korean does not withstand scrutiny. The Charterers could have insisted on a contract in the Korean language, especially as the owners were also Korean. The fact that they did not do so was a commercial decision that they made at the time.

23. The Charterers' reliance on the The New York Convention argument is misplaced because the Charterparty does include the parties' written agreement to refer disputes to arbitration: see clause 24 of the Charterparty and the Centrocon Arbitration Clause. Furthermore, the fact that the dispute relates to the laytime calculations of 47 voyages under the Charterparty will not cause the arbitrators any difficulty. Both Mr Oakley and Mr Farrington have combined commercial shipping experience of more than 70 years and are very familiar this type of

14

dispute. The fact that there are 47 disputes is not unusual in long term contracts of this nature. Furthermore, the Charterers' lack of knowledge or experience of London arbitration proceedings should not be the cause of any concern to them given that they have access to competent legal and commercial advice. Mr Oakley and Mr Farrington are extremely experienced maritime arbitrators who are bound to act in accordance with the provisions of Arbitration Act 1996.

24. Further, it does not follow that simply because the parties are Korean companies that the natural forum for arbitration is in Korea. The Charterers did not suggest that there were relevant provisions of Korean law which prevented two Korean companies engaged in international business from arbitrating in London. Korean shipping and trading companies often agree to incorporate London arbitration and English law into their charterparties and both arbitrators have substantial experience of such arbitrations.

25. The fact that the Charterers were not familiar with the abbreviation of the LMAA (or LMMA) Small Claims Procedure is, in our view, not a defence. The Charterers should have made sure that they understood these terms when agreeing to the terms of the Charterparty. Brokers, in particular, are well versed in arbitration clauses and are familiar with London arbitration.

26. Although the Charterers did make reference to the undisputed balance of US$85,559.71 in their submissions of 26th September, the payment of this sum is not a feature of this interim final award. However, it is our understanding that the Charterers now intend to pay this sum once the local holidays have finished. Since the amount is undisputed, it is to be hoped that this sum will be paid forthwith, thus avoiding the threatened application from the Owners following publication of this First Award.

27. We have therefore decided that we do have substantive jurisdiction to determine all disputes that arise under or out of the Charterparty and that the governing law of the Charterparty is English law.

15

28. This arbitration award is interim in the reference, however final as to matters decided herein. We reserve our jurisdiction to make further Award(s) in respect of matters not dealt with herein.

29. The Charterers shall bear their costs of this First Award, together with the Owners' recoverable costs on the standard basis. We reserve to ourselves jurisdiction to assess such costs. The Charterers shall also pay our costs of this First Award. Interest has been awarded, where appropriate, at rates and in a manner which is consistent with the practice in London maritime arbitration.

16

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

**AND**

<u>IN THE MATTER OF AN ARBITRATION</u>

B E T W E E N

DAEWOO LOGISTICS CORPORATION of Seoul, Korea
Claimants
(Owners)

and

KOREA CEMENT CO LTD of Jang Seong, Korea
Respondents
(Charterers)

**Charterparty dated 11th November 2003**
(for a Contract of Affreightment)

**FIRST FINAL ARBITRATION AWARD**